**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | | |
|---|---|---|
| **JENNIFER JOHNSON,** | ) | |
| **NANCY VAN CAMP, AND** | ) | |
| **DENNIS FERRIER** | ) | |
| | ) | |
| **Plaintiffs,** | ) | **CIVIL ACTION NO. _____** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **MEREDITH CORPORATION** | ) | |
| **d/b/a CHANNEL 4** | ) | **JURY DEMAND** |
| | ) | |
| **Defendant.** | ) | |

---

## COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF AGAINST CHANNEL 4

---

### I. Introduction

This lawsuit is about a television news station that transformed into a workplace where veteran on-air personalities were permitted to become the targets of a persistent pattern and practice of age discrimination, harassment, hostility, and retaliation. Plaintiffs Jennifer Johnson, Dennis Ferrier, and Nancy Van Camp (collectively "Plaintiffs") suffered actionable harms from the unlawful employment practices of Defendant Meredith Corporation d/b/a WSMV-TV Channel 4 ("Defendant" or "Channel 4"). For their Complaint, Plaintiffs state as follows:

### II. Parties

1.    Plaintiff Jennifer Johnson worked as a news anchor and reporter at Channel 4. Ms. Johnson's employment relationship with Channel 4 dates back to the 1990s. Ms. Johnson has won and/or contributed to multiple Emmy Awards for Channel 4. Ms. Johnson is a citizen and resident of Middle Tennessee who at all times relevant to this Complaint was

1

employed by the Defendant at Channel 4 located at 5700 Knob Road, Nashville, TN 37209. She is over forty (40) years old.

2.  Plaintiff Nancy Van Camp worked as a meteorologist and reporter at Channel 4. Ms. Van Camp is extremely accomplished and was considered a fan favorite at Channel 4 since the 1990's. Ms. Van Camp is a citizen and resident of Middle Tennessee who at all times relevant to this Complaint was employed by the Defendant at Channel 4 located at 5700 Knob Road, Nashville TN 37209. She is over forty (40) years old.

3.  Plaintiff Dennis Ferrier worked as a reporter at Channel 4 for nearly a quarter century. He won and/or contributed to a double-digit number of Emmy Awards. Mr. Ferrier has built a reputation for in-depth and trustworthy reporting. Mr. Ferrier is known for his warm personality, professional demeanor, and the donning of a uniquely-personal ushanka[1] during cold winter broadcast. Mr. Ferrier is a citizen and resident of Middle Tennessee who at all times relevant to this Complaint was employed by the Defendant at Channel 4 located at 5700 Knob Road, Nashville, TN 37209. He is also over forty (40) years old.

4.  Defendant Meredith Corporation is a publicly-traded multimedia conglomerate. Meredith owns and operates Channel 4 and many other news and media affiliates. Meredith Corporation does not maintain its corporate headquarters in Tennessee. Instead, Meredith Corporation is based in Des Moines, Iowa. Channel 4 is a Nashville television news station this is located at 5700 Knob Road Nashville, TN 37209. Channel 4 is a wholly owned entity under the corporate umbrella of Meredith Corporation. For purposes of this

---

[1] A ushanka is a fur-textured cap that can be tied up to the crown of the cap, or fastened at the chin to protect the ears, jaw, and lower chin from the cold.

Complaint, Meredith Corporation and Channel 4 are one and the same, identified throughout this Complaint by its d/b/a "Channel 4."

### III. Jurisdiction and Venue

5.  This Court has jurisdiction under 28 U.S.C.§§ 1331, 1332. Venue is proper under 28 U.S.C. § 1391.

6.  Plaintiffs bring this action for declaratory relief, prospective injunctive relief, equitable relief, and all available monetary damages under the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621 (ADEA).

7.  Each Plaintiff filed a timely Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") in 2016. Plaintiffs' discrimination charges allege discrimination on the basis of age related to their employment at Channel 4. Plaintiffs have received their Notice of Suit Rights. This lawsuit is filed timely and in accordance with mutually-agreed-upon tolling agreements between the parties.

8.  The laws prohibiting age discrimination in employment were created for the following purposes: (1) to promote the employment of older persons based on their ability rather than age; (2) to prohibit arbitrary age discrimination in employment; and (3) to help employers and workers find ways of meeting problems arising from the impact of age on employment. 29 U.S.C. § 621(b).

### IV. Facts

9.  Doreen Wade ("Ms. Wade") was the General Manager at Channel 4 in 2015.

10. Matthew Hilk ("Mr. Hilk") was the News Director at Channel 4 at the start of 2015.

11. 2015 was one of the most critically acclaimed years in recent memory for Channel 4.

12. In 2015, Channel 4 was honored with ten (10) Mid-South Regional Emmy Awards. This number of Emmy Awards was greater than all other Nashville news stations combined. Among those Emmy Awards included the prestigious "News Excellence" Award. Additionally, readers of the *Nashville Scene* named Channel 4 "The Best Local News Station" and its longtime evening news anchor Demetria Kalodimos was named "The Best Local TV News Personality."

13. Early in 2015, Channel 4 began a station-wide pattern and practice of age-based employment discrimination and harassment that resulted in the reduction, removal, and/or replacement of many of its veteran on-air personalities.

14. Ms. Wade made a number of comments in the workplace that demonstrate age bias in subsequent employment decision-making.

15. Channel 4 management made comments about getting rid of the "old timers" and bringing on "faces that appeal to a younger demographic." Other related comments referenced bringing on "new blood" and "fresh faces."

16. Around March 2015, Matthew Hilk was fired as Channel 4's News Director. By 2015, Mr. Hilk had worked as the News Director for nearly a decade.

17. Jim Gilchriest replaced Mr. Hilk as News Director in 2015.

18. After Mr. Hilk was let go, Channel 4 elected to end the employment of Jennifer Herron ("Ms. Herron").

19. Ms. Herron was a longtime Traffic Anchor and Reporter at Channel 4.

20. Ms. Herron was a highly regarded on-air talent at Channel 4.

21. Channel 4 decided to end Ms. Herron's employment shortly after she: (1) notified Channel 4 that her father had become afflicted with a serious health condition; and (2) notified

4

Channel 4 that she intended to take entitled leave under the FMLA related to her father's serious health condition.

22. Channel 4 responded to Ms. Herron by: (1) targeting Ms. Herron with increased hostility during subsequent interactions and communications; (2) telling Ms. Herron that she would not be employed at Channel 4 much longer; (3) abruptly informing Ms. Herron that it would not be renewing her contract for her continued employment after June 2015; and (4) removing Ms. Herron and replacing her with a substantially younger on-air personality.

23. Jennifer Herron was over 40 years old when she was let go by Channel 4 in 2015.

24. Channel 4 immediately assigned Ms. Herron's former duties as the morning traffic anchor to Melanie Layden ("Ms. Layden").

25. Melanie Layden is substantially younger than Ms. Herron.

26. Melanie Layden, upon information and belief, was in her 20's when Channel 4 elected to end the employment of Jennifer Herron.

27. Channel 4's stated-reasons for ending Ms. Herron's employment are false and a pretext for unlawfully-based employment decision-making.

28. Jennifer Herron filed a Charge of Discrimination with the Equal Employment Opportunity Commission alleging age discrimination against Channel 4 after her termination. A lawsuit regarding Channel 4's FMLA violations related to Ms. Herron's termination was filed in the United States District Court for the Middle District of Tennessee in 2017.

29. Next, in August 2015, Channel 4 decided to end its employment relationship with Adrianne Flores ("Ms. Flores").

30. Ms. Flores was a veteran reporter and fill-in anchor at Channel 4.

31. Ms. Flores was a highly regarded Channel 4 on-air talent.

5

32. Ms. Flores was over 40 years old at the time her Channel 4 employment ended. Ms. Flores is also African-American (Black).

33. Channel 4 hired Briona Arradondo ("Ms. Arradondo") to replace Ms. Flores in August 2015.

34. Briona Arradondo is substantially younger than Ms. Flores.

35. Upon belief, Ms. Arradondo was in her 20's when she was hired by Channel 4 to replace Ms. Flores. Ms. Arradondo is also African-American (Black).

36. The decision to end Ms. Flores' employment was made and/or influenced by Ms. Wade, Mr. Gilchriest, and other members of Channel 4 management and Human Resources.

37. Upon information and belief, the decision to end Ms. Flores' employment was motivated by the consideration of her age.

38. Later in 2015, Channel 4 elected to end its employment relationship with veteran on-air talent Patrick McMurtry ("Mr. McMurtry").

39. Patrick McMurtry worked as an anchor and reporter for Channel 4.

40. Mr. McMurtry was over 40 years old when Channel 4 elected to end its employment relationship with him.

41. Plaintiffs and other veteran on-air personalities observed that Channel 4 management targeted Mr. McMurtry with undeserved criticism, scrutiny, and ridicule on a regular basis at Channel 4.

42. The decision to end Mr. McMurtry's employment was made and/or influenced by Ms. Wade, Mr. Gilchriest, and other members of Channel 4 management and Human Resources.

6

43.     Upon information and belief, the decision to end Mr. McMurtry's employment was motivated by the consideration of his age.

44.     Incidents of age discrimination at Channel 4 started early in 2015, and increased in frequency and severity after Jim Gilchriest was hired as the News Director.

45.     Plaintiffs and other veteran on-air personalities began noticing a clear pattern of age-based employment decision-making from Channel 4 management, especially in light of: (a) the successive removal of Jennifer Herron, Adrianne Flores, and Patrick McMurtry in 2015; (b) Channel 4's election to replace older on-air personalities with substantially younger on-air personalities, including Briona Arradondo and Melanie Layden; and (c) a rise in workplace hostilities, criticisms, public beratement, adverse work assignments, and other forms of disparate treatment against older on-air personalities that were not targeted at similarly-situated younger on-air personalities by Channel 4 leadership.

46.     Discussions amongst Plaintiffs and other veteran on-air talent about incidents of age discrimination and the existence of a hostile work environment took place on a regular basis between 2015 and 2016. Said discussions occurred on a regular, at least bi-weekly, basis during this time period.

47.     As the longest continuous news personality in Channel 4 history, longtime news anchor Demetria Kalodimos was a leader at Channel 4 who exercised considerable influence at the station before the events giving rise to this litigation. Plaintiffs and witnesses are aware that Channel 4 management targeted Ms. Kalodimos with many acts of age-based discrimination and hostility, including: (a) public berating, ridicule, and the lessening of her influence in the station's creative direction; (b) spreading false rumors among personnel that Ms. Kalodimos would soon be "retiring" [when Ms. Kalodimos has no

7

retirement plans]; and (c) referring to Ms. Kalodimos as an "old maid," "matron," or "matriarch" at Channel 4.

48. On multiple occasions, veteran on-air personalities made Channel 4 aware of their concerns that Channel 4 was becoming a place where age discrimination and workplace hostilities were increasing.

49. Channel 4 received employee-complaints about Channel 4 engaging in a **"persistent pattern and practice of discrimination."**

50. In October 2015, an internal discrimination complaint was made to Channel 4. *See Exhibit A, October 2015 Internal Discrimination Complaint*. (the "October 2015 Complaint).

51. The October 2015 Complaint stated: **"I wish to make you aware of serious issues at WSMV involving what I believe to be a persistent pattern and practice of discrimination in the workplace, particularly on the basis of age …"** *Id*.

52. The October 2015 Complaint made specific reference to Channel 4's terminations of Jennifer Herron and Adrianne Flores as a part of **"a series of recent firings and promotions, which likewise appear to be motivated by age."**

53. Channel 4 took no preventative or corrective action in response to the October 2015 Complaint. It did not conduct a legitimate formal internal investigation. No older on-air personalities were interviewed as a part of any investigation into the October 2015 Complaint.

54. No management or human resources agent was disciplined, terminated, or otherwise reprimanded as a result of the allegations raised in the October 2015 Complaint.

55. Channel 4's failure to take preventative or corrective action in response to the October 2015 Complaint permitted management to engage in additional acts of discrimination,

retaliation, and harassment against veteran on-air personalities – including Plaintiffs Johnson, Van Camp, and Ferrier.

56.  Jennifer Johnson ("Ms. Johnson") started in 2015 as a News Anchor.

57.  Ms. Johnson is over 40 years old.

58.  Ms. Johnson was highly regarded and highly evaluated as a Channel 4 on-air talent.

59.  Channel 4 and Gilchriest were aware that Ms. Johnson was in the midst of a life-changing set of circumstances. Namely, following the death of her husband in 2015, Ms. Johnson was transitioning into her role as a single mother.

60.  In or around October 2015, Jennifer Johnson was demoted by Channel 4. Ms. Johnson was demoted from News Anchor to Reporter. No performance-based reason was given for Ms. Johnson's demotion.

61.  For Ms. Johnson, the role of Reporter was less-prestigious, less-visible, and came with more-burdensome work shifts and job assignments than the News Anchor position.

62.  As a News Anchor, Ms. Johnson's shifts and assignments permitted her to care for her daughter, earn a living, and perform all assigned work tasks without hardship.

63.  As a Reporter, Ms. Johnson was intentionally assigned undesirable and extremely burdensome field assignments, locations, and work shifts.

64.  After becoming aware that its work assignments were making Ms. Johnson's ability to care for her daughter more difficult, Channel 4 gave her more difficult and burdensome job assignments in order to compel her resignation. Such adverse job assignments were given to Ms. Johnson on a regular and routine basis. Younger reporters were given more favorable field assignments, shifts, and other terms and conditions of employment.

9

65.  Channel 4 also began targeting Ms. Johnson with increased hostility during daily interactions, job performance criticisms, and other adverse treatment. Ms. Johnson witnessed, observed, or became aware that similar treatment was being targeted at other veteran on-air talent as 2015 progressed. Younger on-air personalities received more favorable treatment from Channel 4 management during daily interactions and communications.

66.  Around Thanksgiving 2015, Channel 4 told Ms. Johnson that her contract would not be renewed after its expiration because it was going in a "different direction."

67.  The ordinary business practice of Channel 4 is to raise discussions about contract renewal within one or two months before the expiration of the existing employment contract.

68.  Ms. Johnson's employment was set to expire around September 2016.

69.  Channel 4 told Ms. Johnson that her contract would not be renewed over ten (10) months before the expiration of her existing employment contract.

70.  Channel 4's actions: (a) caused Ms. Johnson fear, anxiety, humiliation, and stress; (b) were atypical of Channel 4's ordinary practices regarding employment contract discussions; and (c) were done in order to compel Ms. Johnson's early resignation.

71.  Ms. Johnson was constructively discharged in December 2015. Prior to her constructive discharge, Ms. Johnson was compelled to work in a hostile work environment that subjected veteran on-air personalities to persistent age discrimination and hostilities.

72.  Ms. Johnson bid her viewers farewell in a professional manner, despite: (1) feeling forced to leave her job by Channel 4 through a series of adverse treatment and adverse actions; and (2) believing that Channel 4 was becoming an increasingly hostile work environment for older on-air personalities.

73. The reasons given for the actions against Ms. Johnson are a pretext for age discrimination and created an intolerable work environment.

74. Two substantially younger female on-air personalities, including Liz Lohius, were hired by Channel 4 after it became aware of Ms. Johnson's constructive discharge.

75. Ms. Johnson filed a timely Charge of Discrimination with the Equal Employment Opportunity Commission against Channel 4 alleging age discrimination after her termination.

76. Nancy Van Camp is a former meteorologist at Channel 4.

77. Ms. Van Camp was highly regarded and highly evaluated as a Channel 4 on-air talent.

78. Ms. Van Camp is over 40 years old.

79. Around September 2015, Ms. Van Camp's employment contract expired.

80. Channel 4 decided that it would not renew Ms. Van Camp's employment contract.

81. Rather than immediately end its employment relationship with Ms. Van Camp, Channel 4 continued to employ Ms. Van Camp as a meteorologist on an at-will basis.

82. Channel 4 does not typically permit on-air talent to work without a contract for a fixed term. No younger on-air talent employed at Channel 4 was working without the existence of an employment contract, upon information and belief.

83. Channel 4 continued to employ Ms. Van Camp without a contract in order to "buy time" until it found a suitable and substantially younger replacement.

84. Channel 4 eventually found a substantially younger meteorologist to replace Ms. Van Camp.

85. In June 2016, Channel 4 hired Daphane DeLoren ("Ms. DeLoren"). Channel 4 notified Ms. Van Camp that her services in her existing role were no longer needed shortly thereafter.

86. Ms. DeLoren was given the on-air duties that formerly belonged to Ms. Van Camp.

87. Ms. DeLoren is substantially younger than Ms. Van Camp. Upon belief, Ms. DeLoren was in her 20s or early 30s when she was hired by Channel 4.

88. Ms. Van Camp also bid Channel 4 viewers farewell in a professional manner. She did so despite believing that her age motivated Channel 4's decision to end its employment relationship with her.

89. The reason(s) given for the actions against Ms. Van Camp were a pretext for age discrimination.

90. When speaking about Channel 4's election to replace Van Camp with DeLoren, Jim Gilchriest said: **"Out with the old, in with the new."**

91. Ms. Van Camp filed a Charge of Discrimination with the Equal Employment Opportunity Commission against Channel 4 alleging age discrimination after her employment at Channel 4 ended.

92. Also around June 2016, longtime Reporter Dennis Ferrier informed Channel 4 that his father's health was rapidly declining due to congestive heart failure, stroke, and internal hemorrhaging.

93. Dennis Ferrier is a former reporter at Channel 4. He worked as a reporter for almost a quarter century.

94. On June 30, 2016, Mr. Ferrier's father passed away. Hours later, after finding out about the passing of his father, Mr. Ferrier made a minor misstatement of fact on the June 30, 2016 broadcast regarding a police matter.

95. Reporting misstatements are not uncommon in the news broadcast industry. Most often, reporting misstatements are easily corrected by the issuance of a "Correction Notice."

12

96. Channel 4 did not take any immediate action against Mr. Ferrier for the minor misstatement made on the June 30, 2016 broadcast.

97. On or about July 5, 2016, Mr. Ferrier voiced concerns about the hostile work environment existing at Channel 4 to Human Resources.

98. Human Resources was told about: (a) a number of insults and hostilities that Gilchriest had recently targeted at him; (b) the existence of a hostile work environment; and (c) disrespectful comments from management about Mr. Ferrier and other veteran on-air personalities – including Ms. Kalodimos and longtime anchor/sports-reporter Rudy Kalis.

99. Similarly-situated younger on-air talent was not targeted with the same types of insults, ridicule, and hostilities that were regularly aimed at Mr. Ferrier and other older on-air personalities by Channel 4 management.

100. Channel 4 did not launch a formal investigation into Mr. Ferrier's complaint to HR. No preventative or corrective action was taken by Channel 4 in response to his allegations. No member of Channel 4 management was reprimanded, counseled, or disciplined as a result of Mr. Ferrier's July 2016 internal complaint.

101. On or about July 5, 2016, Mr. Gilchriest became aware that Mr. Ferrier told Human Resources about his concerns about the circumstances existing at Channel 4 and the comments made by Mr. Gilchriest.

102. Mr. Ferrier became an immediate target for retaliation by Mr. Gilchriest and Channel 4.

103. Between July 8, 2016 and about July 11, 2016, Mr. Ferrier took approved bereavement leave to attend his father's funeral in California.

104. On or about July 12, 2016, Mr. Ferrier returned to work.

13

105. Immediately upon returning to work from attending his father's funeral, Channel 4 fired Mr. Ferrier.

106. At the termination meeting, Jim Gilchriest told Mr. Ferrier that he should/could "just retire" rather than being documented as being fired. This was not the first time Gilchriest suggested to Mr. Ferrier that he should "retire."

107. Other insults were targeted at Mr. Ferrier by Gilchriest during the termination meeting, including being called "unprofessional," "a f---king liar," "bombastic," and an "underperformer."

108. On other occasions, including shortly before Mr. Ferrier's termination, Gilchriest said: **"You can't teach an old dog new tricks"** in reference to Mr. Ferrier and other veteran on-air personalities.

109. Channel 4's asserted reason for firing Mr. Ferrier is pretextual, unworthy of credence, did not actually motivate its decision to end Mr. Ferrier's employment. The asserted reason given by Channel 4 was insufficient to motivate his termination. Mr. Ferrier did not have a history of poor performance, inaccurate reporting, or any other job-related issue. Mr. Ferrier only had one prior issue related to alleged inaccurate reporting (regarding the Holly Bobo case), but Mr. Ferrier's reporting was later vindicated by information revealed in court or other proceedings and documents.

110. On multiple occasions, substantially younger on-air personalities made the same or more serious reporting misstatements or inaccuracies than Mr. Ferrier. The misstatements in reporting by younger on-air personalities did not result in discipline, reprimand, or termination.

111. Mr. Ferrier was always a highly regarded and highly evaluated reporter at Channel 4.

112. Mr. Ferrier's performance evaluations and assessments were solid for his entire time at Channel 4.

113. Mr. Ferrier had his reporting assignments subsequently given to Kevin Trager ("Mr. Trager").

114. Mr. Trager is substantially younger than Mr. Ferrier.

115. Mr. Ferrier also filed a Charge of Discrimination with the Equal Employment Opportunity Commission against Channel 4 alleging age discrimination and retaliation after his employment at Channel 4 ended.

116. Additional complaints about discrimination at Channel 4 were made in 2016. For example, in August 2016, a letter was written to Channel 4 by a present longtime news anchor alerting Defendant of the following: "**In October 2015, I made you aware of serious issues at WSMV involving what I believe to be a persistent pattern and practice of discrimination in the workplace, particularly on the basis of age and gender.**" *See Exhibit B, August 2016 Discrimination Complaint.*

117. The August 2016 Complaint specifically mentioned the terminations of Ms. Van Camp and Mr. Ferrier.

118. Regarding the termination of Ms. Van Camp, the August 2016 Complaint states:

   a) **"The recent removal of Meteorologist Nancy Van Camp after 20 years of service (and a loyal fan base) cannot be explained, except by the immediate hiring of Daphne DeLoren, who is obviously much younger than Nancy"; and**

   b) **"Staff have been told to hide the truth from viewers who inquire and say it was Nancy's choice to leave. I know that to be untrue and as of this writing, Nancy is unemployed and has no job prospects."**

15

119. Regarding the termination of Mr. Ferrier, the August 2016 Complaint states:

    a) **"I know from interviews with several parties involved that the error was not one that was unprecedented or particularly egregious [sic]"; and**

    b) **"Even the Metro Police Department top brass acknowledged the minor nature of the error … and the correction made was totally satisfactory to them."** *Id.*

    c) **"His dismissal occurs at a time when a much younger reporter Kevin Trager, has been given his [Mr. Ferrier's] shift … in fact Trager was told there was soon to be an 'opening.'"**

120. Mr. Ferrier received an award from the Metro Police Department for his excellence in reporting shortly after his termination from Channel 4.

121. Channel 4 did not conduct a formal investigation into the August 2016 Discrimination Complaint.

122. Channel 4 did not take any preventative or corrective action in response to the August 2016 Discrimination Complaint.

123. Channel 4 did not discipline, reprimand, or take any action whatsoever against the members of Channel 4 management as a result of the allegations alleged in the August 2016 Discrimination Complaint.

124. Veteran on-air personalities have made multiple efforts to correct the conditions existing at Channel 4 by raising their observations to Defendant. Defendant has repeatedly refused to take preventative or corrective action in response to their complaints. Defendant has refused to accept responsibility for the harms it has caused Plaintiffs and other veteran on-air personalities as a result of age discrimination.

125. The above-numbered facts, and other facts not included in the Complaint, identify a persistent pattern and practice of discrimination and hostile work environment at Channel 4.

126. Channel 4 acted willfully and with malice or reckless indifference to Plaintiffs' rights to work in an environment free from discrimination, harassment, and retaliation.

127. Plaintiffs have lost substantial income and other privileges and benefits of employment.

128. Plaintiffs have incurred medical expenses that otherwise would not have incurred. Plaintiffs suffered embarrassment, humiliation, emotional distress and mental anguish, stress and anxiety, exacerbation of medical conditions, damage to their reputations, inconvenience, and loss of enjoyment of life. Plaintiffs have also incurred attorneys' fees, costs, and litigation expenses.

## V. Claims

### AGE DISCRIMINATION IN VIOLATION OF THE ADEA

129. Plaintiffs Johnson, Ferrier, and Van Camp incorporate by reference all of the preceding paragraphs of the Complaint as if set forth fully herein.

130. Channel 4 discriminated against Plaintiffs Johnson, Ferrier, and Van Camp in the terms and conditions of their employment on the basis of their age in violation of the ADEA. Defendant's acts of discrimination were a part of a pattern and practice of discrimination on the basis of age, which created an intolerably hostile work environment on that basis.

131. The actions taken by Channel 4 caused Plaintiffs Johnson, Ferrier, and Van Camp to suffer both monetary and non-monetary losses.

132. Because of Channel 4's discriminatory conduct, Plaintiffs Johnson, Ferrier, and Van Camp are entitled to an award of back pay and benefits, compensatory and punitive damages,

17

injunctive relief, attorneys' fees and costs, and all other appropriate damages, remedies, and other relief available under the ADEA and all federal statutes providing remedies for violations of the ADEA.

HOSTILE WORK ENVIRONMENT IN VIOLATION OF THE ADEA

133. Plaintiffs incorporate by reference the preceding paragraphs of the Complaint.

134. Channel 4 discriminated against Plaintiffs Johnson, Ferrier, Van Camp, and other on-air personalities in the form of harassment, discrimination, and retaliation that was severe, pervasive, and accumulated in a hostile work environment for Plaintiffs and other members of this protected class.

135. Channel 4 allowed and failed to remedy a hostile work environment on the basis of age that altered Plaintiffs' working conditions in violation of the ADEA's prohibitions against such behavior. Defendant's acts of discrimination were a part of a pattern and practice of discrimination, harassment, and hostility on the basis of age – which resulted in a hostile work environment.

136. The actions taken by Channel 4 caused Plaintiffs Johnson, Ferrier, and Van Camp to suffer both monetary and non-monetary losses.

137. Because of their actions, Plaintiffs Johnson, Ferrier, and Van Camp are entitled to an award of back pay and benefits, compensatory and punitive damages, injunctive relief, attorneys' fees and costs, and all other appropriate damages, remedies, and other relief available under the ADEA and all federal statutes providing remedies for violations of the ADEA.

RETALIATION

138. Plaintiff Ferrier incorporates by reference the preceding paragraphs of the Complaint as if set forth fully herein.

18

139.  Plaintiff Ferrier engaged in protected activity by complaining about discrimination and hostile work environment based on age at Channel 4 – including regular and repeated incidents of hostility, harassment, ridicule, and unfounded criticism.

140.  In retaliation for Plaintiff Ferrier's protected activities, Channel 4 responded by increasing hostilities, ridicule, and unfounded criticisms for the remainder his employment; and terminating Mr. Ferrier's employment based on pretextual claims that reflect discrimination and retaliation.

141.  Through such retaliation, Channel 4 violated Plaintiff Ferrier's rights under the ADEA.

142.  Channel 4's actions following Plaintiff's complaints related to age discrimination and age-based workplace hostility were committed with reckless disregard to his right to be free from discriminatory treatment because of his opposition to discriminatory and retaliatory practices that violated the ADEA. Through its actions, Channel 4 deprived Plaintiff of equal employment opportunities and benefits because of his willingness to oppose such unlawful employment practices.

143.  Channel 4's actions against Plaintiff Ferrier (and others) caused him (and others) to suffer both monetary and nonmonetary damages.

144.  Thus, Plaintiff Ferrier is entitled to an award of back pay and benefits, compensatory and punitive damages, injunctive relief, attorneys' fees and costs, and all other appropriate damages, remedies, and other relief available under the ADEA and all other federal statutes providing remedies for violations of the ADEA.

## VI. Prayer for Relief

WHEREFORE, Plaintiffs demand a **TRIAL BY JURY** and that the following relief be granted:

A.      That this Court take jurisdiction of this matter;

B.      That process be served;

C.      That Plaintiffs be awarded a declaratory judgment that Defendant violated the aforementioned laws articulated in this Complaint;

D.      That this Court enter a permanent injunction, prohibiting Defendant from engaging in unlawful employment practices;

E.      That Plaintiffs be reinstated to full-time positions with back pay and all benefits, privileges, and rights previously denied;

F.      That the Court award Plaintiffs back pay and front pay in an amount to be determined at the trial of this case;

G.      That the Court award compensatory and punitive damages in an amount to be determined by the trier of fact;

H.      That the Court award Plaintiffs their costs in this action and reasonable attorneys' fees;

I.      That the Court grant to Plaintiffs the right to have a trial by jury on all issues triable to a jury; and

J.      That the Court grant such additional equitable and monetary relief as the Court deems proper and just.

Case 3:17-cv-01493   Document 1   Filed 11/27/17   Page 20 of 21 PageID #: 20

This 27th day of November 2017.

/s/ Brian C. Winfrey

_____

Brian C. Winfrey (#025766)
MORGAN & MORGAN, PC
TN Bar No. 02576
810 Broadway, Suite 105
Nashville, Tennessee 37215
(615) 601-1276 or (615) 473-3243
bwinfrey@forthepeople.com

s/ Rob McGuire

_____

Rob McGuire (#021594)
Rob McGuire Law
3102 West End Ave. 4th Floor
Nashville, TN 37203